Filed 6/26/26  In re S.H.G. CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| In re S.H.G., a Person Coming Under the Juvenile Court Law. | |
| S.D. COUNTY HEALTH & HUMAN SERVICES AGENCY, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> C.H., <br><br> Defendant and Appellant. | D087018 <br><br> (Super. Ct. No. J521650) |

APPEAL from orders of the Superior Court of San Diego County, Daniela A. Reali, Judge.  Affirmed in part, reversed in part, and remanded with instructions.

Jacob I. Olson, under appointment by the Court of Appeal, for Appellant and Defendant.

Damon M. Brown, County Counsel, Lisa M. Maldonado, Chief Deputy County Counsel, and Silvia P. Romero, Deputy County Counsel for Plaintiff and Respondent.

## INTRODUCTION

C.H. (Mother) appeals from an October 20, 2025 jurisdictional finding and dispositional orders removing her infant daughter, S.H.G. (Child), from her custody. The juvenile court assumed jurisdiction under Welfare and Institutions Code[1] section 300, subdivision (b), after Child was born with methamphetamine in her system, hospital staff noticed that the parents were not waking to feed or change the infant, and both parents tested positive for methamphetamine. Child's father (Father) has not appealed.

Mother challenges the sufficiency of the evidence supporting the juvenile court's jurisdictional and dispositional findings. She contends that removing Child from her custody without substantial evidence violated her rights under the Fourth and Fourteenth Amendments to the Constitution. Finally, she argues the court abused its discretion by denying her alternate request for overnight visitation.

We conclude substantial evidence supports the juvenile court's assertion of jurisdiction, but we do not find substantial evidence in the record supporting the court's finding that the San Diego County Health & Human Services Agency (the Agency) made "reasonable efforts" to prevent Child's removal and demonstrated that there were no "reasonable means" to protect Child other than removing her from Mother's custody. Accordingly, we reverse the dispositional order and remand the matter to the juvenile court for further proceedings.

---

[1] Further undesignated statutory references are to the Welfare and Institutions Code.

2

FACTUAL AND PROCEDURAL BACKGROUND

I.

*Incidents Leading to Agency Intervention*

Mother and Father lived together for three years before Child's birth. In May 2025,[2] Mother called emergency services because Father, who reported having epilepsy, had a seizure. By the time paramedics arrived, Mother's water had broken.

In the emergency room, Father informed medical staff that he used methamphetamines weekly, had used it three days before, and also drank alcohol. He disclosed that Mother actively used fentanyl and methadone, although he denied having made this statement a week later. Mother meanwhile reported to labor and delivery staff that she used opiates until 14 weeks of gestation and that "other household members currently use substances." She refused to be tested.

Child was born later that day and tested positive for amphetamines and methamphetamine. The next day, a nurse discovered a vape pen between Mother's legs during a bleeding check. When a social worker notified the parents of Child's positive drug test result, Mother responded, "Good, because that won't hurt her."

A social worker interviewed the parents about their substance use history, and Father reported having a "remote" substance abuse and alcohol use history. When asked if he engaged in drug treatment, he stated, "I did it on my own." Mother denied any current or past drug use. She did, however, claim someone drugged her four months before. The social worker explained that a positive newborn urine drug screen reflects exposure within the past

---

[2]    All further dates are to 2025 unless otherwise noted.

few days. Mother responded, "Baby hasn't been exposed to anything here," and then stopped talking.

When a different social worker interviewed Mother the same day, Mother reported that she had stopped smoking marijuana three years before and denied recently drinking alcohol. She said Father was "the drinker." She denied using fentanyl and methadone but acknowledged having used methamphetamine twice about a year before. She explained that someone drugged her at a Halloween party they hosted. Earlier in 2025, a houseguest known to be a "prankster" also likely put something in her drink. She said people frequently stayed in their home and engaged in substance use. When asked about this, Mother said the guests usually smoked "everything" from cigarettes to crack cocaine. But she claimed they cut off all ties, and no one was allowed to stay anymore.

Meanwhile, on the evening of Child's birth, a nurse entered Mother's room and observed Child crying in the bassinet while Mother and Father slept on the bed. She woke Mother to feed the baby, and the nurse changed and swaddled her.

On May 11, a nurse asked about the 5:30 a.m. feeding, and Mother reported she had fed the infant at 7:00 a.m. The nurse re-educated Mother about feeding every two to three hours. When the nurse returned to ensure the 10:00 a.m. feeding had occurred, she found Child in the bed between both parents, who were sleeping soundly and did not wake when she entered the room. The nurse moved the baby to the crib and educated the parents on safe sleeping. When she asked about the 10:00 a.m. feeding, Father said they fed the baby at 9:00 a.m. The nurse noted that both parents were sleepy and were unclear about when Child last ate.

4

The next night, a nurse reported having to wake the parents once after more than four hours had passed since the last documented feeding. She asked several times if the parents had changed the baby's diaper. Father stated that he had changed it once, and the parents otherwise indicated they had checked it several times. But when the parents subsequently asked for help swaddling the infant, the nurse became concerned that the parents had not in fact checked the diaper. She unwrapped Child to teach the parents how to swaddle and discovered meconium on Child's diaper, blankets, arms, legs, abdomen, and chest.

A social worker asked Mother to submit to a toxicology test, but Mother declined. She later acknowledged having used methamphetamines one to three days before giving birth and agreed to drug test. Father admitted having used "[a]ll" substances in the past and attending numerous drug and alcohol treatment facilities. He agreed to drug test. Mother tested positive for methamphetamine and Father tested positive for amphetamines, phenobarbital, and barbiturates.[3]

The hospital transferred Child to Rady Children's Hospital to monitor whether a bloody stool indicated a bowel obstruction, but the children's hospital ultimately cleared her as healthy.

The parents agreed to safety plans under which Child would be placed with nonrelated extended family members. The plans required the parents to abstain from all substances when caring for the newborn during visits, to contact a substance use specialist for treatment assessments, and to randomly drug test. Prior to these safety plans expiring on June 3, Mother

---

[3]    Father later reported taking barbiturates to prevent seizures.

tested negative, but Father tested positive for amphetamines, methamphetamine, barbiturates, phenobarbital, and alcohol.

The parents agreed to a new safety plan requiring them to remain substance-free while caring for Child and to participate in substance use programs. The parents meanwhile engaged in quite a few structured, unsupervised visits at one of the Agency's offices with no reported issues. Mother completed intake at Serenity House and Father underwent detox at Interfaith. Mother's intake urinalysis on June 17 was positive for methamphetamine, but her levels decreased over the next three tests, which her case manager said indicated she was not continuing to use. A worker found a vape pen with unknown contents in Mother's room on June 24. Her drug test the next day was positive for methamphetamine, but again, at a decreased level not indicative of use that day.

The Agency filed a section 300 petition, alleging there was a substantial risk that Child would suffer serious harm or illness because of the parents' inability to protect her or provide regular care due to substance abuse. (§ 300, subd. (b)(1)(A), (D).)

II.

*Detention Hearing*

At the July 8 detention hearing, Mother's counsel highlighted Mother's progress in treatment and requested she be given custody of Child at Serenity House, which accommodates children. The Agency opposed this request, noting the parents' recent drug use, Mother's lack of credibility as demonstrated by her changing stories about drug use during pregnancy, the parents' failure to care for the baby in the hospital, and their questionable decision-making as to whom they allowed in the family home.

6

The court determined it was premature to return Child to Mother and detained Child with the nonrelated extended family members.

## III.

### *The Parents' Progress*

Mother continued to make progress in her treatment at Serenity House. She consistently tested negative, participated in a range of classes, and completed a course on preventative healthcare for a newborn baby. Her counselor reported that Mother was very gentle with the baby and noticeably attentive. She said Mother was one of her easier clients and did what she is supposed to do. According to the counselor, Mother "[k]eeps the baby covered and is really doing a great job."

Father initially tested negative in late July but then tested positive for alcohol. Both parents experienced challenges in juggling treatment and visitations, but they remained in their inpatient treatment programs. No concerns were noted during visitation, and the parents remained calm during one visit where Child cried most of the time.

In early August, Father had a positive breathalyzer alcohol test the same day he and Mother had their first structured, unsupervised visit at a new Agency office.

Mother wrote to the court expressing concern for her daughter's emotional and physical wellbeing and requested a trial placement with her. During court hearings in July and August, she again requested custody, but the court continued to detain Child with the caregivers. Both parents visited consistently three days a week for three hours each day.

In late August 2025, Father was discharged from Interfaith and showed a social worker his studio apartment. Father did not feel bringing the baby to that apartment was the best option as the area and neighbors

7

were not conducive to successful reunification and sobriety. A mental health services program supervisor explained to the Agency that even if Father's request to move was approved, it would take two to three months, and he could lose the current housing if Mother moved in with him in the meantime. Father subsequently entered a 10-day residential detox program through McAllister and then transitioned to an outpatient program on September 15.

By September 15, Mother had successfully completed residential treatment at Serenity House, in addition to completing 1.5 hours of infant and toddler parenting classes, 18.2 hours of a preschool parenting group, and 1.5 hours of individual parenting sessions. She received recognition for making all her hours and child visits and supporting staff and her peers. She began engaging in unsupervised visitation, enrolled in an outpatient treatment program, and moved into Father's apartment.

Mother requested overnight visits during a September 15 pretrial status conference. Counsel noted she had completed all her treatment and parenting programs, had consistently tested negative, was seeing a psychologist and enrolled in intensive outpatient aftercare, and already had unsupervised visitation. The court declined to modify visitation because Mother had only begun unsupervised visitation (as opposed to structured unsupervised visitation at an Agency office) 10 days earlier and had only just moved out of inpatient care the previous day.

On September 22, Mother's counselor reported Mother's drug sample possibly spilled during transportation and was not of sufficient quantity to be tested. Her September 24 test was positive for trace amounts of methamphetamine. The counselor stated this amount was not consistent with someone having smoked methamphetamine, so she could not confirm Mother had actually smoked the drug. The Agency expressed concern she

was either using substances or in the presence of substances. Mother denied using or being around methamphetamine.

Father tested negative in September, but the Agency was unable to reach his counselor for an update during the two weeks prior to the jurisdictional and dispositional hearing. The Agency expressed concern about returning Child to the parents while they were at different levels of visitation. It also noted Mother's recent positive test and suggested she used methamphetamine or was in the presence of this substance. Given Interfaith's concerns about Father's consistency and punctuality and the lack of update on his progress, the Agency did not recommend progressing his visitation.

IV.

*Contested Jurisdictional and Dispositional Hearing*

The court convened a hearing on October 20 to address jurisdiction and disposition. Mother requested that the court dismiss the petition and place Child with the parents. Counsel highlighted that Mother went right into inpatient treatment, made tremendous progress over the preceding four months, and completed inpatient treatment and all her parenting courses. She also promptly enrolled in continuing outpatient care the day after leaving Serenity House. Counsel suggested Mother's positive test could have resulted from prescription medication she was taking and provided a letter from a community health center in support. As evidence of Mother's support system, an individual from Jewish Family Services, a peer support, and Mother's case manager all attended the hearing.

9

Mother's attorney highlighted that the Agency had not discussed reasonable services to keep Child safe in the home in lieu of removal. But, if the court declined to return Child, Mother requested "overnights at a location of the Agency's choosing," which could be a hotel if needed.

The court sustained the petition under section 300, subdivision (b). It relied on evidence that Child tested positive for methamphetamine and amphetamines at birth and that Mother admitted using methamphetamine shortly before Child's birth and continued to test positive thereafter. The court also cited Father's long history of substance abuse and concerns that the parents were unable to provide proper care.

As to disposition, the court acknowledged the parents' recent progress in services but found clear and convincing evidence that removal was necessary. The court emphasized that both parents were only at the beginning stages of addressing their substance abuse, noted Father's long history of use, and cited Mother's recent positive test showing trace amounts of methamphetamine. The court was not persuaded by the explanation of a possible cross-reaction with Mother's prescription medication because the community health center letter indicated the test might show PCP, not methamphetamine use. The court concluded that the Agency had made reasonable efforts to avoid removal, that returning the infant to the parents would pose a substantial danger to her physical health, safety, and well-being, and that there were no reasonable means to protect Child short of removal.

The court set both parents' visitation levels as unsupervised on the condition that they continue to test negative. Child remained placed with the nonrelated extended family members.

10

DISCUSSION

Mother contends the juvenile court's jurisdictional and dispositional orders are not supported by substantial evidence. She further argues the court abused its discretion in denying her alternate request for overnight visitation. We affirm the jurisdictional order but reverse the dispositional order.

I.

*Substantial Evidence Supports the Juvenile Court's Assertion of Jurisdiction*

A juvenile court may exercise dependency jurisdiction over a child who has suffered or is at a substantial risk of suffering serious physical harm or illness as a result of the parents' failure to adequately supervise or protect the child. (§ 300, subd. (b)(1)(A).) The parents' inability to provide regular care for the child due to the parents' substance abuse may also justify adjudging the child a dependent of the court. (*Id.*, subd. (b)(1)(D).) The Legislature has declared that "[t]he provision of a home environment free from the negative effects of substance abuse is a necessary condition for the safety, protection and physical and emotional well-being of the child." (§ 300.2.)

To establish jurisdiction under section 300, subdivision (b)(1), the Agency must "demonstrate the following three elements by a preponderance of the evidence: (1) neglectful conduct, failure, or inability by the parent; (2) causation; and (3) serious physical harm or illness or a substantial risk of serious physical harm or illness." (*In re L.W.* (2019) 32 Cal.App.5th 840, 848.) The third element requires a showing that at the time of the jurisdictional hearing, the child is at substantial risk of serious physical harm in the future. (*In re Jesus M.* (2015) 235 Cal.App.4th 104, 111.)

12

Standing alone, past conduct is insufficient to establish a substantial risk of harm and "there must be some reason beyond mere speculation to believe [the past conduct] will reoccur." (*In re Ricardo L.* (2003) 109 Cal.App.4th 552, 565.) But "[t]he court need not wait until a child is seriously abused or injured to assume jurisdiction and take the steps necessary to protect the child." (*In re R.V.* (2012) 208 Cal.App.4th 837, 843.)

" 'In reviewing the jurisdictional findings . . . we look to see if substantial evidence, contradicted or uncontradicted, supports them. [Citation.] In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court.' " (*In re R.T.* (2017) 3 Cal.5th 622, 633.)

There is little question Mother put her infant at risk of serious physical harm in the past by exposing her to methamphetamine in utero and, together with Father, by subsequently using methamphetamine and neglecting to feed her. The parents also slept with the baby between them on a bed where she risked suffocation. But Mother contends the court could not rely solely on these past harms to justify asserting jurisdiction because Mother had significantly ameliorated them through treatment, education, and counseling. She further argues the "isolated and inconclusive" positive test result for methamphetamine, viewed in the context of her otherwise consistent negative drug testing and sustained participation in treatment, did not constitute substantial evidence of a current substance abuse problem or a resulting risk of harm to Child at the time of the jurisdictional hearing. We disagree and conclude the court's jurisdictional finding was supported by substantial evidence.

13

What made it reasonable for the court to conclude by a preponderance of the evidence that there was a nonspeculative risk this conduct would recur is the timing of recent events. Father admitted to relapsing just over a month before the jurisdictional hearing. On September 15, he and Mother moved into the studio apartment that Father opined was not conducive to successful reunification and sobriety. Within less than 10 days of living in this unstructured environment, Mother tested positive for methamphetamine. She denied using or being around methamphetamine just as she had in the hospital. Given her positive test result, the court could reasonably interpret this as resorting to her prior lack of candor about her drug use. Although the level was not necessarily reflective of her smoking methamphetamine, Mother had acknowledged being exposed to drugs in her home in the past. Thus, the court may reasonably have concluded that the infant would also be exposed to methamphetamine if returned home. Furthermore, to the extent Mother characterizes the test as "inconclusive," she asks us to reweigh the evidence on appeal, which we cannot do. (*In re I.J.* (2013) 56 Cal.4th 766, 773.)

Additionally, although Father tested negative upon being released from detox on September 15, the Agency was unable to determine whether he remained sober or in treatment because it could not reach his providers for several weeks in October. Given Father's long history of substance abuse, treatment, and relapse, and his recent relapse, the court did not have a reasonable basis to assume Father had remained sober and able to adequately care for Child. Mother's positive test suggesting exposure to methamphetamine further undermined such a conclusion.

14

We acknowledge that courts have repeatedly noted that "drug use or substance abuse, without more, is an insufficient ground to assert jurisdiction in dependency proceedings under section 300." (See, e.g., *In re L.W., supra,* 32 Cal.App.5th at p. 849.) For example, where the only harm caused by a mother's drug use was her failure to monitor her 13-year-old daughter's homework assignments, an appellate court found inadequate evidence to support section 300, subdivision (b) jurisdiction. (*In re Rebecca C.* (2014) 228 Cal.App.4th 720, 727.) But where a mother had been twice charged and once convicted for driving under the influence and did not enroll in drug treatment after the juvenile court became involved, the court found the "more" necessary to conclude the mother's cocaine use posed a substantial risk of physical harm to her 13-year-old daughter. (*In re L.W.* at p. 850.)

We find the instant situation more like the latter case. Child was only five months old at the time of the jurisdictional hearing and entirely dependent upon her parents for feeding and care. The parents' prior drug use resulted in them sleeping through her cries and feeding times, as well as engaging in dangerous sleeping habits. Mother also had not been candid about her drug use. Mother's recent positive test and denial, coupled with Father's relapse a month before, provided substantial evidence under the low preponderance of the evidence standard that there was substantial risk Child would suffer these serious physical harms again if placed in Mother's custody. Accordingly, the juvenile court appropriately assumed jurisdiction over Child.

15

## II.

### *The Portion of the Dispositional Order Removing Child from Mother's Custody Must be Reversed*

At the disposition hearing, the juvenile court must decide where the child will live. The burden of proof is substantially greater at this phase than it is at the jurisdictional phase. (*In re I.R.* (2021) 61 Cal.App.5th 510, 520.) The court may not remove a child from a parent's physical custody unless it "finds clear and convincing evidence . . . [t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the [child] if the [child] were returned home, *and* there are no reasonable means by which the [child's] physical health can be protected without removing the [child] from the [child's] parent's . . . physical custody." (§ 361, subd. (c)(1), italics added.) As part of this second prong, the court must "make a determination as to whether reasonable efforts were made to prevent or to eliminate the need for removal of the minor from their home." (*Id.*, subd. (e).) The court then "shall state the facts on which the decision to remove the minor is based." (*Ibid.*)

This high standard reflects that the bias of section 361, subdivision (c) is in favor of family preservation, not removal. (*In re M.V.* (2022) 78 Cal.App.5th 944, 959.) " '[O]ut-of-home placement . . . is *a last resort*, to be considered only when the child would be in danger if allowed to reside with the parent.' " (*Ibid.*) Because parents have a presumptive, constitutional right to care for their children, " '[t]he law requires that a child remain in parental custody pending the resolution of dependency proceedings, *despite the problems that led the court to take jurisdiction over the child*, unless the

16

court is clearly convinced that such a disposition would harm the child.' " (*Ibid.*)

"In determining whether a child may be safely maintained in the parent's physical custody, the juvenile court may consider the parent's past conduct and current circumstances, and the parent's response to the conditions that gave rise to juvenile court intervention." (*In re D.B.* (2018) 26 Cal.App.5th 320, 332.) There is no requirement that the parent be dangerous or that the child has suffered harm; the focus is on averting harm to the child. (*Id.* at p. 328.)

"On appeal from a dispositional order removing a child from a parent we apply the substantial evidence standard of review, keeping in mind that the trial court was required to make its order based on the higher standard of clear and convincing evidence." (*In re Ashly F.* (2014) 225 Cal.App.4th 803, 809 (*Ashly F.*).) The question before us is " 'whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true.' " (See *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1011–1012.)

Mother contends the record does not contain substantial evidence, viewed in light of the heightened clear and convincing standard, that she would pose a substantial danger to Child's safety or that there were no reasonable means to protect Child short of removal. Even if we were to find sufficient evidence as to the first prong, we agree the record contains virtually no evidence supporting the court's conclusion as to the second prong of the test.

We find *Ashly F.* instructive here because it highlights the burdens the statutory scheme imposes on both the Agency and the juvenile court to demonstrate that removal is warranted. First, to assist the court in

17

determining whether "reasonable means" exist for protecting the children within the home, the California Rules of Court require the Agency to prepare a social study that, among other things, "must include [¶] . . . [a] *discussion* of the reasonable efforts made to prevent or eliminate removal." (Cal. Rules of Court, rule 5.690(a)(1)(B)(i), italics added; *Ashly F., supra*, 225 Cal.App.4th at p. 809.) As in *Ashly F.*, nowhere in the reports prior to the disposition hearing in this case did the Agency "describe the 'reasonable means' it had considered and rejected." (*Ibid.*)

The Agency's July 28 jurisdiction and disposition report includes a heading for "reasonable efforts," but the items listed under it do not address potential means for protecting Child within the home. Rather, they include such things as referring the parents for services within their case plans (but without providing for a corresponding return of Child to their care), referring Child to services, and providing transportation for visits. The report did not directly respond to Mother's request to have Child join Mother in her room at Serenity House, which could have accommodated an infant. Instead, the Agency simply circled the preprinted option on the recommendation form, which states: "There is or would be a substantial danger to the physical health, safety, protection or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the parents or guardian's physical custody."

In the August 2025 addendum report, the Agency acknowledged the parents' treatment progress but expressed its view that "enough time has not passed to absolutely ensure the safety of [Child] in the parents' care." Once again, it did not discuss any reasonable means of keeping Child safe at Serenity House or elaborate as to what substantial danger would be averted

18

with the passage of more time.[4] And although Father and a service provider expressed several concerns about Mother and Child moving into his studio apartment once Mother completed her inpatient treatment, the report contains no discussion of potential alternate living arrangements for Mother.

The Agency's October 2025 addendum report is likewise devoid of any reasonable means discussion. A social worker expressed concern about returning Child to the studio apartment when Mother and Father were at different levels of visitation, but again, did not address whether there was a way to facilitate Mother living separately with the Child. At the very least, the Agency should have considered options such as "unannounced visits by [the Agency], public health nursing services, [and] in-home counseling services." (*Ashly F., supra,* 225 Cal.App.4th at p. 810.) California dependency law requires that removal be the " 'last resort.' " (*In re M.V., supra,* 78 Cal.App.5th at p. 964.) But here, the Agency did not show it considered any other options other than removal. (See *id.* [reversing based on insufficient evidence of lesser alternatives where neither the Agency nor the juvenile court considered ordering the mother to leave the home as the children's counsel had requested].)

---

4      The amount of time a child under three years old spends out of the parent's custody is particularly important because for such young children the court may schedule a hearing to address termination of parental rights as early as six months after the initial disposition hearing or 12 months after the child entered foster care, whichever is earlier. (§ 366.21, subd. (e)(1), (3); see also *Tonya M. v. Superior Court* (2007) 42 Cal.4th 836, 846–847 [noting the Legislature's goal of providing infants and toddlers with a permanent plan more quickly because they are at a vulnerable stage of development].)

At the disposition hearing, the court likewise did not fully comply with its legal obligations. "The court must consider whether reasonable efforts to prevent or eliminate the need for removal have been made" (Cal. Rules of Court, rule 5.695(d)) and make a finding. (§ 361, subd. (e).) Here, given that the Agency did not explain what reasonable services or alternatives it evaluated to avoid removal and the court did not inquire as to whether any were available, there is no indication the court considered less drastic measures before concluding there were "no reasonable means by which [Child's] physical health [could] be protected without removing [Child] from the parents' . . . physical custody." (*Id.*, subd. (c)(1).) Furthermore, this summary conclusion is inadequate, as section 361 requires that "[t]he court *shall state the facts* on which the decision to remove the minor is based." (*Id.*, subd. (e), italics added.) The court did not state which facts supported its decision that the Agency made reasonable efforts to maintain Child with Mother and that no reasonable means for doing so existed. (See *Ashly F., supra,* 225 Cal.App.4th at p. 810 [concluding the court failed to carry out its duties where it did not state facts supporting its conclusion that reasonable efforts were made].)

Contrary to the plain text of the statute requiring a statement of facts, the Agency argues we may infer from the record that the court considered lesser alternatives before making its determination. Specifically, the Agency contends "it can be inferred from the record the court considered [M]other's counsel's closing arguments requesting the court to order family maintenance with stringent conditions, [and] County Counsel's rebuttal to that argument[,] and found that [M]other's counsel's alternatives would not be reasonable means that could ensure [Child] would not be at substantial risk

20

of physical harm due to the parents' ongoing substance abuse issues." We are not persuaded.

First, as Mother's counsel pointed out at the hearing, the default is that Child should remain with the parents, and it was the *Agency's* burden to demonstrate that it made reasonable efforts to prevent or eliminate the need for removal. Absent any evidence that the Agency, as opposed to Mother, made any reasonable efforts to avoid removal, the court's determination to the contrary under section 361, subdivisions (c) and (e), is not based on substantial evidence. (See *In re L.G.* (2026) 118 Cal.App.5th 1208, 1231–1232 [concluding that where "the Bureau presented no evidence that it had explored interventions to mitigate remaining sources of risk and determined they were infeasible . . . the juvenile court could not reasonably conclude that the Bureau met its burden of proof"].)

Second, County Counsel did not respond to Mother's specific proposals or the changed circumstances since Child's initial detention. Rather, counsel stated only "the Court can see what kind of care this child receives when the parents are under the influence" and "the Agency would like the Court to consider . . . that type of risk that this child will be subjected to in the event that the mother and the father do end up using again." This argument does not explain why the visits up to several times per week by Jewish Family Services that Mother proposed, coupled with support from Mother's case manager, peer support, and the other organizations Mother was receiving services from would not provide reasonable means to keep the baby safe. Moreover, it provides, at most, speculation that nebulous harm would recur *if* the parents started using drugs again.

21

Nonetheless, we may not reverse despite the Agency's and juvenile court's errors in neglecting to fully comply with the statutory mandates unless it is reasonably probable the court would have reached a result more favorable to the appellant in the absence of the error. (*In re Cristian I.* (2014) 224 Cal.App.4th 1088, 1098–1099; *In re Jason L.* (1990) 222 Cal.App.3d 1206, 1218.) Here we cannot conclude the errors were harmless because the record suggests that other means may well have ensured Child's safety while still allowing Mother to retain physical custody. (See *Ashly F., supra*, 225 Cal.App.4th at p. 810 [finding failure to follow statutory mandate and Rules of Court prejudicial where "[a]mple evidence" of reasonable means to protect children in their home existed]; *In re Henry V.* (2004) 119 Cal.App.4th 522, 529 [same]; see also *In re Hailey T.* (2012) 212 Cal.App.4th 139, 149 [reversing where court failed to explore alternatives to removal].)

Mother addressed the circumstances that lead to Child's initial detention by promptly enrolling in residential treatment a month after Child was born and obtaining a room where Child could reside with her and staff could ensure Mother's sobriety and Child's safety. She consistently tested negative for substances; sought to address her parenting deficiencies by participating in a wide range of parenting classes; and was commended for going "above and beyond" during her time at Serenity House. The Agency progressed her to unsupervised visitation and reported only positive feedback from Mother's visits with her daughter. Upon her release from Serenity House, Mother immediately enrolled in an outpatient treatment program. Father repeatedly expressed that he supported placing Child with Mother. And Mother introduced multiple individuals at the hearing who were willing to provide services and support, including home checks several times per

week.  Notably, the court also found it appropriate to progress Father to unsupervised visitation at the conclusion of the hearing, thereby eliminating the Agency's only hesitation to returning Child to parents' custody, as stated in its October 2025 report.  On this record, had the Agency provided a social study detailing its reasonable efforts to implement some combination of random drug testing, unannounced Agency visits, support visits from Jewish Family Services, and housing Mother and Child separately from Father, it is reasonably probable the court would have concluded that reasonable means existed to allow Child to remain safely with Mother.

But especially when viewed through the lens of a clear and convincing evidence standard (*Conservatorship of O.B., supra*, 9 Cal.5th at pp. 1011–1012), we conclude the record here contains virtually no evidence on the "reasonable efforts" and "reasonable means" questions.  Accordingly, we reverse the dispositional order and remand the matter for a new disposition hearing at which the Agency can attempt to demonstrate what reasonable efforts have been made to prevent removal based on the facts existing at the time of the new disposition hearing (see *Ashly F., supra*, 225 Cal.App.4th at p. 811), and why no reasonable means short of removal exist.  We express no opinion on how the juvenile court should rule upon remand.[5]

---

[5]   Given our decision to reverse the dispositional order, we need not address Mother's challenges to the order on constitutional grounds.  Additionally, because the court's new dispositional finding on remand may obviate the need for visitation or because the facts as they exist at the time of the new disposition hearing may alter the court's assessment of the appropriate level of visitation if it continues to find removal appropriate, we need not address Mother's challenge to the court's order denying overnight visitation.

## DISPOSITION

The juvenile court's jurisdictional order is affirmed. The dispositional order is reversed, and the matter is remanded for a new disposition hearing in compliance with section 361. "On remand the juvenile court must make a decision based on the facts existing at the time of the further proceedings." (*In re Abram L.* (2013) 219 Cal.App.4th 452, 464, fn. 6.)

DO, J.

WE CONCUR:


O'ROURKE, Acting P. J.


CASTILLO, J.